**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **KATHERINE SHARP,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Case No. 09-CV-606-TLW** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**OPINION AND ORDER**

Plaintiff Katherine Sharp seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i) and 423, and 1382c(a)(3).  In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge.  (Dkt. # 13).  Any appeal of this decision will be directly to the Tenth Circuit.

Plaintiff's application for disability insurance benefits was filed on March 6, 2006, alleging an onset date of June 1, 2001.  (R. 16).  Plaintiff's date last insured is June 30, 2005.  (Dkt. # 19 at 1).  The Administrative Law Judge ("ALJ ") held a hearing on November 5, 2008.  (R. 21).  On December 24, 2008, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the SSA.  (R. 13-23).  The Appeals Council denied review on October 23, 2009.  (R. 1-4).  The decision of the Appeals Council represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. § 404.981.  On September 17, 2009, plaintiff filed the subject action with this Court.  (Dkt. ## 1, 2).

The role of the Court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is only to determine whether substantial evidence supports that decision and whether the applicable legal standards were applied correctly. See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. Casias v. Secretary of Health & Human Service, 933 F.2d 799, 800 (10th Cir. 1991).

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of impairment and the severity of the impairment during the time of his alleged disability. 20 C.F.R. § 404.1512(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by (an individual's) statement of symptoms." 20 C.F.R. § 404.1508. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 404.1513(a).

## Issues

Plaintiff argues that the ALJ's Decision should be reversed for the following three reasons:

1. The ALJ failed to fully develop the record.
2. The ALJ failed to properly consider the plaintiff's credibility.
3. The ALJ's RFC assessment is not supported by substantial evidence.

(Dkt. # 19 at 4).

## Factual Background

Plaintiff was born on October 30, 1951, and was 57 years old at the time of her hearing before the ALJ. (R. 108). She alleges that she stopped working because she has "problems sitting or standing for long periods," her hand "cramp(s) & freeze(s) into a claw like position," and her "shoulders hurt and go numb." (R. 135). Plaintiff alleges that she cannot wear button-up shirts, has a difficult tying her shoes, getting in and out of the bath tub, raising her arms to wash her hair, shaving, and using the toilet if the seat is too low. (R. 144). Plaintiff prepares food or meals approximately three times a week. (R. 145). She is able to make cereal, sandwiches, and "put a roast in crock pot." Id. Plaintiff's husband usually helps her wash dishes. Id. Washing dishes can take her an hour. Id. When plaintiff does the laundry, it usually takes a few hours, but her husband moves the laundry from the washing machine to the dryer and brings her the clothes. Id. Plaintiff goes outside at least once a day but does not perform any yard work. (R. 146). Plaintiff can drive a car, but she does not drive very far due to pain. Id. Plaintiff shops in stores once a week for one to two hours, primarily for food. Id. Plaintiff takes Prozac, Trazodone, Gabapentin, Tramadol, Celebrex, Ultram-ER, and Aciphex. Id. Plaintiff claims that certain of these medications cause her a loss of memory and make her sleepy. (R. 181-85).

Plaintiff's earliest medical records are from June and August, 1997, when she saw Dr. Redding. (R. 259). These records are incomplete and contain no information regarding Dr. Redding's first name, his specialty (if any), or where he practices. Id. The records indicate that plaintiff saw Dr. Redding for back pain and, about nine weeks later for knee pain. Id. Dr. Redding wrote that "conservative care" was appropriate and that plaintiff could "return to work." Id.

In July, 2001, plaintiff began seeing Dr. Jeffrey Emel at Eastern Oklahoma Orthopedic Center for right arm and hand pain as well as right ankle pain. (R. 221). Dr. Emel's examination showed no acute distress, forearm tenderness, negative Finkelstein test, negative Tinel's sign, and positive Phalen's sign within 10 seconds. (R. 222). Plaintiff had full range of motion (ROM) and good strength in the wrists and fingers. Id. On July 13, 2001, plaintiff saw Dr. R. Tyler Boone (also with EOOC) for her back. Dr. Boone's examination notes indicate that plaintiff stood erect and level at the shoulder and pelvis, that her spinal range of motion was good, that there was no point tenderness in the lumbar spine, that she had excellent motor strength bilaterally and good range of motion in both hips with negative straight leg raise. (R. 220). Dr. Boone's impression was that plaintiff "flared up the degenerative changes in her lumber spine, but she looks to be doing fairly well." Id. Dr. Boone "reinforced for her the need to get back on a home exercise program." Id.

On July 18, 2001, Dr. Emel saw plaintiff again and gave her an injection in the carpel tunnel and trigger points of her right ring finger. (R. 219). On September 6, 2001, an EMG showed no nerve impingement but plaintiff was quite tender over the ulnar nerve. (R. 218). On October 10, 2001, plaintiff again showed no improvement in her right arm, and Dr. Emel

prescribed Neurontin and noted that if she does not improve, an examination with Dr. Boone for possible ulnar nerve transfer may be necessary. (R. 217).

On November 7, 2001, plaintiff saw Dr. Emel and showed no improvement. (R. 216). On November 15, 2001, Dr. Emel wrote a letter stating that plaintiff had developed bilateral ulnar nerve palsy in the forearms and was exquisitely tender along the medial aspect of the elbows. (R. 215). His also said that plaintiff's ulnar gutter was painful, and he recommended a surgical consult for possible ulnar nerve transfers. Id. On November 26, 2001, plaintiff saw Dr. Emel again after having an EMG. (R. 214). The EMG showed carpel tunnel syndrome. However, plaintiff did "not have significant cubital tunnel impairment." Id. Dr. Emel recommended night splints and possible surgical intervention, since plaintiff had been symptomatic for three months and had undergone other types of treatment. Id. Dr. Emel saw plaintiff again on December 21, 2001. (R. 213). Plaintiff had not improved, so Dr. Emel recommended a surgical consultation. Id.

In January, 2010, plaintiff was referred to Dr. Boone. On January 10, 2002, Dr. Boone reported that plaintiff was complaining of bilateral elbow pain and hand numbness. (R. 234). The pain was worse at night and when performing repetitive activities with her arm. Id. An examination revealed full range of movement at her elbows. Id. The ulnar nerve was stable with positive Tinel's sign over the cubital tunnel. Id. There was ulnar nerve function distally and positive ulnar nerve flexion tests. Id. The medial epicondylar was moderately tender on the right. Id. An x-ray was normal, as was her EMG. Id. On February 4, 2002, plaintiff's tests again were unremarkable, and her X-rays were normal. (R. 233). Dr. Boone's "impression" was that plaintiff had bilateral ulnar nerve problems and cubital tunnel syndrome. Id.

Plaintiff had ulnar nerve decompression surgery on February 8, 2002. (R. 232). Dr. Boone reported on March 25, 2002 that plaintiff was doing well and had full motion. (R. 231). Dr. Boone wrote that it was his belief that plaintiff would need her left elbow decompressed at some point. Id. Plaintiff saw Dr. Boone on April 29, 2002. (R. 230). Dr. Boone reported that plaintiff had full motion, a "little bit of intrinsic atrophy," some pain medially, and some intermittent tingling "down into her hand," but "(o)verall her hand feels quite good." Id. On June 6, 2002, Dr. Boone wrote to Zurich Insurance that plaintiff's condition was "probably status quo." (R. 229). He said that "she is safe to do most things with her right upper extremity," and he noted that she is having ulnar nerve symptoms on the left upper extremity, and he "believe(s) she would benefit from an ulnar nerve decompression" on that side as well. Id.

Plaintiff had decompression surgery on her left arm in August, 2002. (R. 227-28). On August 29, 2002, Dr. Boone wrote that the following week she could "return to one arm work endeavors if those are available." (R. 226). Dr. Boone also noted that plaintiff would do her rehabilitative therapy on her own at home. Id. On September 5, 2002, Dr. Boone reiterated that plaintiff could "return to one arm work endeavors. . .." On September 30, 2002, Dr. Boone wrote that plaintiff "is about six weeks out from her left elbow ulnar nerve decompression doing well. Her elbow motion is full. Grip strength is good. Intrinsic strength is good. I have discussed her previous work scenario, and I think we concur that she should be able to return to this in approximately two weeks." (R. 225). On November 14, 2002, Dr. Boone wrote that plaintiff had reached " . . . maximum medical improvement. She has nice resolution of the bulk of the pain in her arms and hands. She demonstrates full range of motion, normal strength and normal sensory exam." (R. 223). Dr. Boone further wrote that plaintiff would be given a 15% permanent partial impairment rating for both arms. Id. Plaintiff's testimony at the hearing was

inconsistent with Dr. Boone's observations and discussions with plaintiff; she testified that she still had "a lot of pain and numbness and tingling" after the surgeries and that she would "drop a lot of things." (R. 38-39).

On November 14, 2002, plaintiff was examined by a chiropractor, Dr. Hugh G. McClure, DC., as part of a workers' compensation claim. (R. 285-293). Contrary to what she told Dr. Emel, plaintiff told Dr. McClure that, after her surgeries, she has experienced an increase in pain and electrical sensation "when she rests her elbows on anything" and that she has "difficulty pushing, twisting, pulling and lifting" and has stiffness in her arms and shoulders. (R. 287). Dr. McClure's examination also revealed range of motion impairment. (R. 289). In general, plaintiff related far worse symptoms to Dr. McClure than she did to Dr. Boone (despite seeing both on the same day), and Dr. Morse's examination revealed symptoms and impairments that had never been described by plaintiff to, or noted by, Dr. Boone or Dr. Emel. (R. 288-89). In addition, Dr. Morse found plaintiff's impairment to be forty-one percent to her right arm and forty percent to the right hand, findings that are inconsistent with Dr. Boone's finding of fifteen percent impairment. (R. 290).

On March 24, 2005, plaintiff saw Dr. Robert Sweeten, MD, complaining of decreased sleep due to stress and her back. (R. 270). An MRI showed a small herniation at L3-4 with no spinal stenosis. There was moderate facet hypertrophy at L4-5 and moderate to severe at L5-S1. (R. 269). In December, 2005, plaintiff saw Dr. M. Reburn, M.D. for a bone density and vertebral assessment. (R. 278). Plaintiff was still complaining of back pain at this time, but the tests revealed normal bone density and only two mild deformities. Id. On March 2, 2005, Dr. Redding indicated that plaintiff had a left knee medial meniscus tear. (R. 259). On December

13, 2005 an x-ray revealed mild thoracic scoliosis. (R. 265). Plaintiff did not mention her knee during the hearing.

<u>**Discussion**</u>

The ALJ found that plaintiff's bilateral carpal tunnel repair, degenerative disc disease, mild thoracic scoliosis, and left knee injury were severe impairments. (R. 18). None of plaintiff's impairments met or equaled a listed impairment. 20 CFR Pt. 404, Subpt. P, App. 1. (R. 19). The ALJ found that the plaintiff could perform light work except she could not handle or finger continuously but could do so frequently. (R. 20). Thus, the ALJ found that plaintiff is not disabled, because she can perform her past relevant work as a receptionist or check encoder.[1]

Plaintiff first argues that the ALJ failed to develop the record and should have called a medical advisor to the hearing. Plaintiff argues that the "limitations of (her) arms and hands is (sic) ambiguous as of the plaintiff's (date last insured), June 2005." (Dkt. # 19 at 4). Plaintiff asserts that the last record regarding her hands is from November, 2002 but that she "continued to have problems after that date and that her problems increased." <u>Id.</u> at 5. In support of her argument, plaintiff cites <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167 (10th Cir.1997) and <u>Blea v. Barnhart</u>, 466 F.3d 903, 911 (10th Cir. 2006).

In <u>Hawkins</u>, the Tenth Circuit noted that when a claimant is represented by counsel, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present

---

[1] The ALJ's decision was made at step four in the five step sequential analysis required under <u>Williams v. Bowen</u>, 844 F.2d 748, 750-52 (10th Cir. 1988). The five-step sequence provides that the claimant (1) is not gainfully employed, (2) has a severe impairment, (3) has an impairment which meets or equals an impairment presumed by the Secretary to preclude substantial gainful activity, listed in Appendix 1 to the Social Security Regulations, (4) has an impairment which prevents her from engaging in her past employment, and (5) has an impairment which prevents her from engaging in any other work, considering her age, education, and work experience. <u>Ringer v. Sullivan</u>, 962 F.2d 17 (10th Cir. 1992) (unpublished) (citing <u>Williams v. Bowen</u>, 844 F.2d at 750-52.)

claimant's case in a way that the claimant's claims are adequately explored. Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development. In the absence of such a request by counsel, we will not impose a duty on the ALJ to order a consultative examination unless the need for one is clearly established in the record." Id. (citations omitted). Here, claimant was represented by counsel at the hearing. (R. 24). The ALJ asked plaintiff's counsel if he had reviewed the file and if he had any additional documents to submit. (R. 27). After correcting a misunderstanding regarding a prior application for benefits, plaintiff's counsel responded that he did not have any additional records to submit. (R. 27-28). He also did not ask for further development of the record or request that a medical advisor be called at the hearing. Id. Likewise, when asked to explain his theory of the case, plaintiff's counsel argued that plaintiff's upper extremities remained impaired even after her surgeries. Id. at 30. He did not request or mention a need for further development of the record. (R. 29-30). Hawkins does not support plaintiff's position.

In Bea, the Tenth Circuit said that "medical evidence of onset is ambiguous, an ALJ is obligated to call upon the services of a medical advisor." Id. at 912. Here, the medical evidence of onset date is not ambiguous, and plaintiff is not even making this argument. Rather, plaintiff is asserting that the medical evidence after her onset date is ambiguous. She is incorrect on this point as well, since there is ample medical evidence in the record for the relevant period, the time between the onset date and the date last insured.

Plaintiff also argues that the ALJ's decision to give "great weight" to the state agency opinion is in error, because "the state agency did not give an opinion." (Dkt. # 5). Defendant does not counter this statement. The Court agrees with plaintiff. There is no agency opinion in the Record, as least not one that the Court can find, and the ALJ did not provide a cite to the

agency opinion to which she referred.  The only document in the record that is remotely close to

an agency opinion is a one page "CASE ANALYSIS" signed by Dr. Shafeek Sanbar.  (R. 307).

But, Dr. Sanbar does not render an opinion in this document, other than to stated that the "MER

is insufficient to make an assessment prior to the DLI in 2004."  Id.  Thus, this matter must be

remanded.  On remand, the ALJ is directed to explain her statement regarding the agency

opinion (including specific cites to the record).

Plaintiff raises as a second issue the ALJ's credibility determination.  The Court finds

that there is substantial evidence supporting the ALJ's credibility determination and that the ALJ

linked that evidence to her credibility finding.  The ALJ cited plaintiff's failure to mention her

knee at the hearing.  The ALJ noted and rejected Dr. McClure's findings, which are contradicted

by those of plaintiff's treating physicians (Dr. Boone and Dr. Emel) and are from the same time

period.  The ALJ also noted that there is no evidence of "a disabling spine impairment as of the

claimant's date last insured, only mild degenerative disc disease," a finding that is supported by

the record.

Third, plaintiff asserts that the ALJ's RFC assessment is not supported by substantial

evidence.  The Court agrees with plaintiff, in part.  To the extent that the ALJ's explanation of

the state agency opinion leads her to a different conclusion regarding plaintiff's RFC, then the

ALJ will need to reevaluate her current RFC determination.[2]

---

[2] Although the Court's review indicates that there is substantial evidence in the record to support
the ALJ's current RFC assessment, it is not the role of the Court to make that determination.

## **Conclusion**

Thus, the Court REVERSES and REMANDS the decision of the Commissioner as set forth herein.

SO ORDERED this 28th day of March, 2011.

_____
T. Lane Wilson
United States Magistrate Judge